COMPLAINT EXHIBIT 1

LOAN AGREEMENT

by and among

FNF FARMS, LLC, a California limited liability company
(the "**Borrower**")

FARID ASSEMI, a married man;
FARSHID ASSEMI, a married man; and
DARIUS ASSEMI, a single man aka Dariush Assemi
(collectively, the "**Guarantors**")

and

METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation
("**Lender**")

Dated as of July ⎽⎽29⎽⎽, 2015

$3,776,000.00

Loan No. 196960

1

LOAN AGREEMENT

THIS LOAN AGREEMENT (this "**Agreement**"), is made and entered into as of July ___29___, 2015, by and among FNF FARMS, LLC, a California limited liability company (the "**Borrower**"), and FARID ASSEMI, a married man; FARSHID ASSEMI, a married man; and DARIUS ASSEMI, a single man aka Dariush Assemi (collectively, the "**Guarantors**" and individually a "**Guarantor**") and METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation ("**Lender**").

W I T N E S S E T H:

WHEREAS, Borrower desires to obtain the Loan (as defined below) from Lender to provide for the restructuring of debt of Borrower and certain Affiliates, and Lender desires to make the Loan on the terms and conditions set forth herein and in the other Loan Documents. Capitalized terms used herein shall have the meanings assigned to them in Section 1 hereof.

NOW, THEREFORE, the Borrower, the Guarantors and the Lender agree as follows:

SECTION 1.   DEFINITIONS.

For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

"**2013 Deed of Trust**" means that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated September 27, 2013 and recorded in the Official Records of Kern, Kings, Madera and Fresno Counties, California as Document Nos. 2013-0213141703, 2013-1318129, 2013-027748 and 2013-0136492, as modified by that certain Modification and Supplement to Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing and Related Loan Documents dated as of April 30, 2014, and recorded in the Official Records of Madera, Fresno and Kings Counties, California on April 30, 2014 as Document Nos. 2014009960, 2014-0048603, and 1406242/1406243, respectively, and recorded in the Official Records of Kern County, California on June 4, 2014, as Document No. 000214063161, encumbering certain real and personal property more particularly described therein, as further amended or modified from time to time.

"**2013 Loans**" means loan nos. 196624, 196625, and 196626 extended by Lender to Borrower and certain Affiliates of Borrower in the aggregate principal amount of up to $300,000,000.00, evidenced by the 2013 Notes.

"**2013 Notes**" means (i) that certain Promissory Note dated September 27, 2013 in the original principal amount of $265,000,000; (ii) that certain Promissory Note dated September 27, 2013 in the original principal amount of $20,000,000; and (iii) that certain Promissory Note

2

dated September 27, 2013 in the original principal amount of $15,000,000, each executed by Borrower and certain Affiliates of Borrower to the order of Lender.

"**2013 Property**" means the real and personal property more particularly described in the 2013 Deed of Trust.

"**2014 Deed of Trust**" means collectively (i) that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing executed by certain Affiliates of Borrower, for the benefit of Lender, dated as of November 25, 2014 and recorded in the Official Records of Fresno and Kern Counties, California, under Document Nos. 2014-0134373 and 0214147671, respectively, encumbering the real and personal property more particularly described therein, and (ii) that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing (second priority) executed by Borrower and certain Affiliates of Borrower, for the benefit of Lender, dated as of November 25, 2014 and recorded in the Official Records of Madera, Fresno, Kern and Kings Counties, California, under Document Nos. 2014027204, 2014-0134371, 2014-0214147669, and 1417394, respectively, encumbering the 2013 Property.

"**2014 Loans**" means loan nos. 196941 and 196942 extended by Lender to certain Affiliates of Borrower in the aggregate principal amount of up to $18,400,000.00, evidenced by the 2014 Notes.

"**2014 Notes**" means (i) that certain Promissory Note dated November 25, 2014 in the original principal amount of $11,400,000.00, and (ii) that certain Promissory Note dated November 25, 2014 in the original principal amount of up to $7,000,000.00, each executed by certain Affiliates of Borrower to the order of Lender.

"**2015 Deed of Trust**" means collectively, (i) that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing executed by certain Affiliates of Borrower, for the benefit of Lender, dated as of June 30, 2015 and recorded on July 2, 2015 in the Official Records of Fresno County, California, under Document No. 2015-0084577, encumbering the real and personal property more particularly described therein, and (ii) that certain that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing (third priority) executed by Borrower and certain Affiliates of Borrower, for the benefit of Lender, dated as of June 30, 2015 and recorded on July 2, 2015 in the Official Records of Madera, Fresno, Kern and Kings Counties, California, under Document Nos. 2015015187, 2015-0084653, 0215086794, and 2015-10644, respectively, encumbering the 2013 Property.

"**2015 Loan**" means loan no. 197579 extended by Lender to certain Affiliates of Borrower in the original principal amount of $7,300,000.00, evidenced by the 2015 Note.

"**2015 Note**" means that certain Promissory Note dated June 30, 2015 in the original

3

principal amount of $7,300,000.00, executed by certain Affiliates of Borrower to the order of Lender.

"**Affiliate**" means any Person which, directly or indirectly, controls or is controlled by or is under common control with Borrower or which beneficially owns or holds or has the power to direct the voting power of five percent (5%) or more of any membership interest of Borrower or which has five percent (5%) or more of its voting interests (or in the case of a Person which is not a corporation, five percent (5%) or more of its equity interest) beneficially owned or held, directly or indirectly, by Borrower. For purposes of this definition, "control" means the power to direct the management and policies of a Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Borrower**" has the meaning specified in the first paragraph of this Agreement.

"**Business Day**" shall mean any day on which banks are required to be open to carry on their normal business in the State of New York.

"**Capital Lease**" means and includes at any time any lease of property, real or personal, which in accordance with GAAP would at such time be required to be capitalized on a balance sheet of the lessee.

"**Capital Lease Obligation**" means at any time the capitalized amount of the rental commitment under a Capital Lease which in accordance with GAAP would at such time be required to be shown on a balance sheet.

"**Closing Date**" has the meaning specified in Section 2.2.

"**Collateral**" means the Real Property, all property and assets, and proceeds thereof, described in, subjected, or intended to be subjected, at any time to the Liens of any of the Collateral Documents.

"**Collateral Documents**" has the meaning specified in Section 2.3.

"**Consolidated Current Assets**" means, as of the date of determination thereof, the aggregate of all assets which in accordance with GAAP would be so classified and appear as current assets on the consolidated balance sheet of Borrower.

"**Consolidated Current Liabilities**" means, as of the date of determination thereof, the aggregate of all liabilities which in accordance with GAAP would be so classified and appear as current liabilities on the consolidated balance sheet of Borrower.

4

"**Consolidated Total Debt**" shall mean, as of the date of determination thereof, the sum of (1) liabilities for borrowed money, (2) liabilities for deferred purchase price of property (excluding accounts payable arising in the ordinary course of business), (3) Capital Lease Obligations, and (4) any guaranty with respect to liabilities of the type described in any of the clauses (1) through (3) hereof; less Subordinated Debt to Affiliates.

"**Deed of Trust**" has the meaning specified in Section 2.3.

"**Default Interest Rate**" means the lesser of (a) sixteen percent (16%) per annum, and (b) the maximum interest rate provided by law.

"**ERISA**" has the meaning specified in Section 4.14.

"**Events of Default**" or "**Event of Default**" has the meaning specified in Section 11.1.

"**GAAP**" means, as to a particular Person and at a particular time of determination, such accounting principles as, in the opinion of the independent public accountants regularly employed by such Person, conform at such time of determination to generally accepted accounting principles.

"**Guarantors**" and "**Guarantor**" has the meaning specified in the first paragraph of this Agreement.

"**Indebtedness**" shall mean (1) all indebtedness or obligations for borrowed money or which have been incurred in connection with the acquisition of property or assets, (2) indebtedness or obligations secured by or constituting any Lien existing on property owned by the Person whose Indebtedness is being determined, whether or not the indebtedness or obligations secured thereby shall have been assumed, (3) Capitalized Lease Obligations, (4) guaranties and endorsements (other than endorsements for purposes of collection in the ordinary course of business), obligations to purchase goods or services for the purpose of supplying funds for the purchase or payment of, or measured by, indebtedness, liabilities or obligations of others and other contingent obligations in respect of, or to purchase or otherwise acquire or service, indebtedness, liabilities or obligations of others (whether or not representing money borrowed), (5) all liabilities in effect guaranteed by an agreement, contingent or otherwise, to make a loan, advance or capital contribution to or other investment in a Person for the purpose of assuring or maintaining a minimum equity, asset base, working capital or other balance sheet condition for any date, or to provide funds for the payment of any liability, dividend or stock liquidation payment, or otherwise to supply funds to or in any manner invest in such Person for such purpose, and (6) any mandatory redeemable preferred stock (including preferred stock the only mandatory redemption payment with respect to which is at maturity) of Borrower held by a Person other than Borrower, at the higher of its voluntary or involuntary liquidation value. A

5

renewal or extension of any Indebtedness without increase in the principal amount thereof shall not be deemed to be the incurrence of the Indebtedness so renewed or extended.

"**Indemnity Agreement**" has the meaning specified in <u>Section 2.5</u>.

"**Land**" means the real property subject to the Deed of Trust.

"**Lien**" means any mortgage, lien, pledge, security interest, encumbrance or charge of any kind, whether or not consensual, any conditional sale or other title retention agreement or any Capital Lease.

"**Loan**" has the meaning specified in <u>Section 2.2</u>.

"**Loan Documents**" means the Note and the Deed of Trust executed concurrently herewith together with this Agreement, the other Collateral Documents and all other documents and instruments evidencing, securing or otherwise relating to the Loan including, without limitation, any U.C.C. financing statements.

"**Net Worth Requirement**" means the collective net worth of the Guarantors as of the Closing Date.

"**Note**" has the meaning specified in <u>Section 2.1</u>.

"**Permitted Encumbrances**" means those Liens and Leases described on <u>Exhibit B</u> to this Agreement.

"**Person**" includes an individual, a corporation, a partnership, a limited liability company, a joint venture, a trust, an unincorporated organization or a government or any agency or political subdivision thereof.

"**Plan**" has the meaning specified in <u>Section 4.14</u>.

"**Real Property**" has the meaning specified in <u>Section 2.3</u>.

"**Related Deeds of Trust**" means (i) the 2013 Deed of Trust, (ii) the 2014 Deed of Trust and (iii) the 2015 Deed of Trust.

"**Related Loan Agreements**" means (i) that certain Loan Agreement executed by certain Affiliates of Borrowers in connection with the 2013 Loans, (ii) that certain Loan Agreement executed by certain Affiliates of Borrowers in connection with the 2014 Loans and (iii) that certain Loan Agreement executed by certain Affiliates of Borrowers in connection with the 2015 Loan.

Loan Agreement
FNF Farms, LLC
Loan No. 196960
78636001.6 0053564-00201

"**Related Loan Documents**" means the Related Notes, the Related Loan Agreements, the Related Deeds of Trust and any other loan document securing, evidencing or otherwise executed in connection with the Related Loans.

"**Related Loans**" means the 2013 Loans, the 2014 Loans and the 2015 Loan.

"**Related Notes**" means the 2013 Notes, the 2014 Notes and the 2015 Note.

"**Restricted Payments**" means dividends paid on capital stock or distributions with respect to membership interest (in either cash or property), and purchases or redemptions of capital stock or membership interest.

"**Subordinated Debt**" means any Debt owed to stockholders, subsidiaries or affiliates that is fully subordinated in right of payment and in respect of security in any respect to Debt evidence by the Note and any of the other Loan Documents.

"**Voting Interest**", as applied to the stock of any corporation, shall mean stock of any class or classes (however designated) having ordinary voting power for the election of a majority of the directors of such corporation other than stock having such power only by reason of the happening of a contingency.

All accounting terms used herein and not expressly defined in this Agreement shall have the meanings respectively given to them in accordance with GAAP as it exists at the date of applicability thereof.

SECTION 2.   LOAN.

2.1   Authorization.   Borrower has duly authorized the delivery of a secured promissory note due on January 5, 2034, in the original principal amount of Three Million Seven Hundred Seventy-Six Thousand and 00/100 Dollars ($3,776,000.00) (the "**Note**"). The interest rate applicable to the balance under the Note (and the adjustment of such interest rate), the repayment terms and other terms applicable to the indebtedness are more particularly set forth in the Note.

2.2   Loan; Closing.   Borrower hereby agrees to borrow from Lender, and Lender, subject to the terms and conditions herein set forth and in the other Loan Documents, hereby agrees to lend to Borrower, the original principal sum of Three Million Seven Hundred Seventy-Six Thousand and 00/100 Dollars ($3,776,000.00) to be disbursed in accordance with this Agreement (the "**Loan**").  The date on which the Deed of Trust (defined below) is duly recorded in Fresno, County, California, which shall be on or before July 31, 2015 shall be hereinafter referred to as the "**Closing Date.**"

2.3   Security.   Payment of the Note and performance of the obligations arising under this Agreement and the Loan shall be secured by a deed of trust, security agreement, assignment

Loan Agreement
FNF Farms, LLC
Loan No. 196960
78636001.6 0053564-00201

of rents and leases and fixture filing (the "**Deed of Trust**") to be granted by Borrower with respect to, <u>inter alia</u>, Borrower's orchard and farming operations and related crops permanent plantings, irrigation facilities and water rights located on Borrower's fee estate in Fresno County, California, all as more particularly described in the Deed of Trust (the "**Real Property**"), and such other documents and instruments as Lender shall reasonably request to further evidence or perfect its security interest in the Collateral. The Deed of Trust, the Collateral Assignment (as defined below), assignments, security and pledge agreements, guarantees and all of the other documents entered into now or in the future in connection with the Loan shall each be dated and delivered on the Closing Date and are collectively referred to herein as the "**Collateral Documents**."

2.4     <u>Water Rights Collateral</u>.  The Collateral shall also include a first lien and security interest in all Water Rights (as defined in the Deed of Trust), including without limitation the rights of Borrower under that certain Water Supply Agreement dated as of even date herewith, executed by Borrower and certain Affiliates which shall be collaterally assigned to Lender pursuant to a Collateral Assignment of Water Supply Agreement and Easement dated as of even date herewith (the "**Collateral Assignment**").

2.5     <u>Guaranty and Indemnity</u>.  Borrower's obligations under the Note, this Agreement and the other Loan Documents shall be guaranteed by Guarantors pursuant to Guaranty Agreements dated as of even date herewith.  The Note is also supported by a separate and independent Unsecured Indemnity Agreement by the Borrower and the Guarantors in favor of Lender (the "**Indemnity Agreement**").

<u>SECTION 3.</u>   <u>DISBURSEMENTS OF LOAN.</u>

Subject to the satisfaction of all conditions precedent to Closing, Lender shall disburse the face principal amount of the Note in the amount of Three Million Seven Hundred Seventy-Six Thousand and 00/100 Dollars ($3,776,000.00) on the Closing Date.  The funds shall be advanced to prepay in part Loan No. 196624 from Lender to Borrower and certain Affiliates, and to allow Borrower to finance the Property with a separate independent loan.

<u>SECTION 4.</u>   <u>REPRESENTATIONS AND WARRANTIES.</u>

Borrower represents and warrants that:

4.1     <u>Financial Statements</u>.  Lender has been furnished with copies of consolidated balance sheets of Borrower, of Guarantors and Affiliates of Borrower as of December 31, 2014 and related statements of cash flows and consolidated statements of operations, statements of stockholder's equity, and statements of cash flows of the Borrower for the fiscal years ended on said dates. Such financial statements, including the related schedules and notes, are complete and correct and fairly present (a) the financial condition of the Borrower, Guarantors and Affiliates

8

as at the respective dates of said balance sheets and (b) the results of the operations and changes in financial position of the Borrower, Guarantors and Affiliates for the fiscal years ended on said dates, all in conformity with generally accepted accounting principles applied on a consistent basis (except as otherwise stated therein or in the notes thereto) throughout the periods involved.

4.2     <u>No Material Changes</u>.   There has been no material or adverse change in the business, operations, properties, assets, prospects or condition, financial or other, of Borrower or Guarantors subsequent to the date of the aforesaid financial statements.

4.3     <u>Liens</u>.   <u>Exhibit B</u> hereto correctly sets forth all Liens securing Indebtedness for money borrowed by Borrower existing on the date hereof, other than liens granted to Lender.

4.4     <u>Licenses</u>.   Borrower possesses and shall continue to possess all trademarks, trade names, copyrights, patents, governmental licenses, franchises, certificates, consents, permits and approvals necessary to enable them to carry on their business in all material respects as now conducted and to own and operate the properties material to their business as now owned and operated, without known conflict with the rights of others.   All such trademarks, trade names, copyrights, patents, licenses, franchises, certificates, consents, permits and approvals which are material to the operations of Borrower, taken as a whole, are valid and subsisting.

4.5     <u>Litigation</u>.   There are no actions, suits or proceedings (whether or not purportedly on behalf of Borrower or any of its members) pending or, to the knowledge of Borrower, threatened against or affecting Borrower or any of its members at law or in equity or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or before any arbitrator of any kind, which involve any of the transactions herein contemplated or the possibility of any material and adverse change in the business, operations, properties, assets, prospects or condition, financial or other, of Borrower and its members; and neither Borrower nor any of its members is in default or violation of any law or any rule, regulation, judgment, order, writ, injunction, decree or award of any court, arbitrator or federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which default or violation might have a material adverse effect on the business, operations, properties, prospects or condition, financial or other, of Borrower and its members, taken as a whole, and for which sufficient funds have been deposited in escrow to pay, in the event of an adverse judgment, all damages claimed thereunder.

4.6     <u>Land Use Litigation</u>.   There are no pending or, to the knowledge of Borrower, threatened proceedings or actions to revoke, attack, challenge the validity of, rescind or modify the zoning of the Land, the subdivision of the Land or any building, construction or other permits heretofore issued with respect thereto, or asserting such zoning, subdivision or permits do not permit the use and operation of the Real Property.   During the term of the Loan, Borrower shall

9

promptly furnish Lender written notice of any litigation affecting or relating to Borrower, any Guarantor or the Real Property.

4.7    Condemnation.    Borrower has not received notice from any governmental or quasi-governmental body or agency or from any person or entity with respect to (and Borrower does not know of) any actual or threatened taking of the Land or any portion thereof, for any public or quasi-public purpose by the exercise of the right of condemnation or eminent domain.

4.8    Availability of Utilities.    All utility services necessary and sufficient for the Land and the Real Property, and the operation thereof for their intended purposes are available at the boundaries of the Land, including, without limitation, water, storm and sanitary sewer facilities, electric and telephone facilities, as applicable.

4.9    Access.    All roads necessary for the full utilization of the Real Property for its intended purpose have either been completed or the necessary rights-of-way therefor have either been acquired by the appropriate governmental authority or have been dedicated to the public use and accepted by such governmental authority, and all necessary steps have been taken by Borrower and such governmental authority to assure the complete construction, installation and acceptance thereof.    All portions of the Real Property have dedicated legal access, either directly or across other portions of the Real Property.

4.10    Leases.    There are no outstanding leases or agreements affecting the Real Property except as disclosed as Permitted Encumbrances.    Borrower will not enter into any lease or other agreement affecting any portion of the Real Property without first obtaining Lender's written consent, other than year-to-year leases for farming purposes, and any such lease or other agreement shall be subordinate, and at Lender's election, expressly subordinate to the lien of Lender's Deed of Trust except as otherwise permitted in the Deed of Trust.

4.11    No Burdensome Provisions.    Borrower is not a party to any agreement or instrument or subject to any charter or other corporate or legislative restriction or any judgment, order, writ, injunction, decree, award, rule or regulation which materially and adversely affects or in the future may materially and adversely affect the business, operations, properties, assets, prospects or condition, financial or other, of Borrower, taken as a whole.

4.12    Compliance with Other Instruments.    Borrower is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any bond, debenture, note or other evidence of Indebtedness of Borrower or contained in any instrument under or pursuant to which any thereof has been issued or made and delivered.    Neither the execution and delivery of this Agreement and the Loan Documents by Borrower, the consummation by Borrower of the transactions herein and therein contemplated, nor compliance by Borrower with the terms, conditions and provisions hereof and thereof and of the Note will violate any provision of law or rule or regulation thereunder or any order,

10

injunction or decree of any court or other governmental body to which Borrower is a party or by which any term thereof is bound or conflict with or result in a breach of any of the terms, conditions or provisions of the articles of incorporation, corporate charter or bylaws of Borrower or of any agreement or instrument to which Borrower is a party or by which Borrower is bound, or constitute a default thereunder, or result in the creation or imposition of any Lien of any nature whatsoever upon any of the properties or assets of Borrower (other than the Liens created by the Collateral Documents). No consent of the members of Borrower is required for the execution, delivery and performance of this Agreement, the Loan Documents or the Note by Borrower other than those delivered to Lender prior to the Closing, if any.

4.13    <u>Disclosure</u>. Neither this Agreement, the Loan Documents nor any of the Exhibits hereto, nor any certificate or other data furnished to Lender in writing by or on behalf of Borrower in connection with the transactions contemplated by this Agreement contains any untrue statement of a material fact or omits a material fact necessary to make the statements contained herein or therein not misleading. To the best knowledge of Borrower, there is no fact which materially and adversely affects or in the future may materially and adversely affect the business, operations, properties, assets, prospects or condition, financial or other, of Borrower, taken as a whole, which has not been disclosed to Lender in writing.

4.14    <u>ERISA</u>. Borrower represents, warrants and covenants that it is acting on its own behalf and that as of the date hereof, it is not an employee benefit plan as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), which is subject to Title I of ERISA, nor a plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended, each of the foregoing hereinafter referred to collectively as a "Plan", and the assets of the Borrower do not constitute "plan assets" of one or more such Plans within the meaning of Department of Labor Regulation Section 2510.3-101. Each of the Borrower also represents, warrants and covenants that it will not be reconstituted as a Plan or as an entity whose assets constitute "plan assets."

4.15    <u>Tax Liability</u>. Borrower has filed all tax returns which are required to be filed and have paid all taxes which have become due pursuant to such returns and all other taxes, assessments, fees and other governmental charges upon Borrower and upon their properties, assets, income and franchises which have become due and payable by Borrower except those wherein the amount, applicability or validity are being contested by Borrower by appropriate proceedings in good faith and in respect of which adequate reserves have been established.

4.16    <u>Governmental Action</u>. No action of, or filing with, any governmental or public body or authority is required to authorize, or is otherwise required in connection with, the execution, delivery and performance by Borrower of this Agreement, the Loan Documents or the Note (other than recordation of the Deed of Trust in the Office of the Recorders of Fresno County, California, and the filing of financing statements with respect to the Collateral in the

11

Office of the Secretary of State of the State of California, all of which will have been duly recorded or filed on or prior to the Closing Date).

4.17    Hazardous Waste.  Neither the Real Property nor any portion thereof nor any other property owned or controlled at any time by Borrower has been or will be used by Borrower or any tenant of the Real Property or any portion thereof for the production, release, storage, handling or disposal of hazardous or toxic wastes or materials other than those pesticides, herbicides and other agricultural and commercial chemicals customarily used in agricultural and commercial operations of the type currently conducted by Borrower on the Real Property all of which have been and will be used in accordance with all applicable laws and regulations.

4.18    Separate Property.  The Real Property is taxed and billed separately from real property not subject to the Deed of Trust.

4.19    No Affiliation.  No director, officer, partner, manager, stockholder or member of Borrower is an officer or director of Lender or is a relative of an officer or director of Lender within the following categories:  a son, daughter or descendant of either; a stepson, stepdaughter, stepfather, stepmother; father, mother or ancestor of either, or a spouse.  It is expressly understood that for the purpose of determining any of the foregoing relationships, a legally adopted child of a person is considered a child of such person by blood.

4.20    No Foreign Person.  Neither Borrower nor any member or partner of Borrower is, and no legal or beneficial interest in a shareholder of Borrower is or will be held, directly or indirectly, by, a "foreign person" under the International Foreign Investment Survey Act of 1976, the Agricultural Foreign Investment Disclosure Act of 1978, the Foreign Investments in Real Property Tax Act of 1980, the amendments of such Acts or regulations promulgated pursuant to such Acts.  Borrower, and all persons holding directly or indirectly any beneficial interest in Borrower, have complied with all filing and reporting requirements of such Acts.  Neither Borrower, nor any actual or beneficial owner of Borrower, nor any intended recipient of the loan appears on the Specially Designated Nationals and Blocked Persons List (the "**SDN List**") as published by the Department of the Treasury of the United States, Office of Foreign Assets Control.

4.21    Office of Foreign Asset Control.  Borrower represents and warrants that neither Borrower nor any of its respective Affiliates is a Prohibited Person and Borrower and all of their respective Affiliates are in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.  At all times throughout the term of the Loan, Borrower and all of their respective Affiliates shall:  (i) not be a Prohibited Person (defined below); and (ii) be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control ("**OFAC**") of the U.S. Department of the Treasury.

Loan Agreement
FNF Farms, LLC
Loan No. 196960
78636001.6 0053564-00201

The term "Prohibited Person" shall mean any person or entity:

(a)   listed in the Annex to, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**");

(b)   that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive order.

(c)   with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)   who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)   that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, www.ustreas.gov/offices/enforcement/ofac, or at any replacement website or other replacement official publication of such list; or

(f)   who is an Affiliate of or affiliated with a person or entity listed above; or

(g)   who is a "disregarded entity" as defined in IRS Regulation 1.1445-2(b)(2)(iii).

The term "Affiliate," as used in this provision, shall mean as to any person or entity, any other person or entity that, directly or indirectly, is in control of, is controlled by or is under common control with such person or entity or is a director or officer of such person or entity or of an Affiliate of such person or entity.  As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a person or entity, whether through ownership of voting securities, by contract or otherwise.

4.22   Additional Representations and Warranties.   As of the date hereof, the representations and warranties contained in the Borrower's Closing Certificate executed by Borrower of even date herewith are true and correct.

4.23   Affiliate Debt.  As of the Closing Date, the only Indebtedness outstanding among Borrower, Guarantors or their respective Affiliates is as set forth in Exhibit C.

13

SECTION 5.    CONDITIONS PRECEDENT.

     5.1    Conditions Precedent to Closing.  Lender's obligations hereunder shall be subject to the conditions precedent that Lender has received on or before the Closing Date in form and substance satisfactory to Lender's counsel, such assurances and evidence as Lender may require of the performance by Borrower of all its agreements to be performed hereunder, to the accuracy of its representations and warranties herein contained, and to the satisfaction, prior to the Closing Date or concurrently therewith, of the following further conditions:

     (a)    Legality.  Lender shall be satisfied that the Note being issued to it on the Closing Date shall qualify on the Closing Date as a legal investment for life insurance companies under the New York Insurance Law (without resort to any provision of such law, such as Section 1405(a)(8) thereof, permitting limited investments by Lender without restriction as to the character of the particular investment) and such purchase shall not subject Lender to any penalty or other onerous condition under or pursuant to any applicable law or governmental regulation; and Lender shall have received such certificates or other evidence as Lender may reasonably request to establish compliance with this condition.

     (b)    Proceedings.  All proceedings to be taken in connection with the transactions contemplated by this Agreement and the Loan Documents, and all documents incidental thereto, shall be satisfactory in form and substance to Lender; and Lender shall have received copies of all documents which Lender may reasonably request in connection with said transactions and copies of the records of all corporate proceedings in connection therewith in form and substance satisfactory to Lender.  Lender shall have received evidence of due formation, existence and authorization of this transaction by the Borrower and Guarantors together with evidence of the authority of each signatory hereto.

     (c)    Representations True; No Default.  The representations and warranties of Borrower in this Agreement and in the Loan Documents shall be true on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date; on the Closing Date no event which is, or with notice or lapse of time or both would be, an Event of Default shall have occurred and be continuing; and Lender shall have received a closing certificate, dated the Closing Date, of the managers, partners and officers, as applicable, of the Borrower to each such effect.

     (d)    Loan Documents.  Lender shall have received on the Closing Date fully executed original counterparts of each of the Loan Documents including all necessary consents.

     (e)    Environmental Audit Results.  The results of any  environmental audit of the Real Property required by Lender, and any remedial action required to be taken by Borrower as a result of such audit, are complete and satisfactory to Lender.

14

(f)     UCC Search.  Current Uniform Commercial Code searches made in the Office of the California Secretary of State on the Borrower, showing no filings relating to the Real Property or Borrower other than those made hereunder and Permitted Encumbrances, and showing no filing which is objectionable to Lender.

(g)     Title Requirements.  Lender shall be furnished on the Closing Date with an ALTA loan policy (2006 Lender's Policy Form) of title insurance with respect to the Deed of Trust, issued to Lender by a title insurance Borrower acceptable to Lender in the amount of the Loan insuring such Deed of Trust, as of the date of the disbursement of the Loan, to be a first and prior lien upon the Land, containing such endorsements and such co-insurance or re-insurance as Lender may request, and showing title to be subject to no matters other than those which may be approved, in writing, by Lender.

(h)     Other Closing Matters.   Lender shall have received such other documentation, assurances, certifications, estoppels and other materials confirming the satisfaction of all closing requirements set forth in the applications for the Loan submitted by Borrower and the terms of the Lender's approval of such applications, as well as the satisfaction of all closing conditions set forth in Lender's instructions to the escrow agent handling the closing of the Loan.

SECTION 6.   FINANCIAL STATEMENTS; COMPLIANCE CERTIFICATES; ADDITIONAL INFORMATION; AND INSPECTION.

6.1     Financial Statements and Reports.  From and after the date hereof and so long as Lender (or a nominee designated by Lender) shall hold the Note, Borrower shall deliver to Lender:

(a)     as soon as practicable after the end of each fiscal year, and in any event within 150 days after the end of each fiscal year, the annual compiled financial statements and related consolidated statements of earnings, equity and cash flows of Borrower, Granville Homes, LLC (and any successor or division thereof), while it remains owned by or Affiliated with any of the Guarantors or Borrower, and Affiliates of Borrower conducting business in the agricultural industry, and the Guarantors as of the end of and for such year, setting forth in each case in comparative form the corresponding figures of the previous fiscal year, all in reasonable detail, prepared in conformity with generally accepted accounting principles applied on a basis consistent with that of previous years (except as otherwise stated therein or in the Note thereto) certified by Borrower, stating that such financial statements present fairly the consolidated financial condition and results of operations and cash flows of Borrower and related entities and the Guarantors in accordance with generally accepted accounting principles consistently applied (except for changes with which such accountants concur); provided, however, that commencing with the 2015 fiscal year of Borrower, all such financial statements and related reports shall be reviewed by an independent third party certified public accountant;

15

(b)      immediately upon a responsible manager, partner or officer of Borrower becoming aware of the existence of a condition, event or act which constitutes an Event of Default or an event of default under any other evidence of Indebtedness of Borrower including, without limitation, an event which, with notice or lapse of time or both, would constitute such an Event of Default or event of default, a written notice specifying the nature and period of existence thereof and what action Borrower, as the case may be, is taking or proposes to take with respect thereto; and

(c)      such other information as to the business and properties of Borrower, including consolidating financial statements of Borrower, Granville Homes, LLC (and any successor or division thereof) and the Guarantors, and financial statements and other reports filed with any governmental department, bureau, commission or agency, as Lender may from time to time reasonably request.

6.2      <u>Inspection</u>.  From and after the date hereof and so long as Lender (or a nominee designated by Lender) shall hold the Note, Lender shall have the right (i) to visit and inspect, at Lender's expense, any of the properties, all at such reasonable times and as often as Lender may reasonably request, of Borrower (including any property not owned by Borrower but upon which any security for the Loan may be located), to examine its books of account and to discuss the affairs, finances and accounts of Borrower and the Guarantors with its and their members, officers and managers and independent public accountants, and (ii) to contact such third parties doing business with Borrower, and to engage in other auditing procedures as Lender deem reasonable to ensure the validity of Lender's security interests or the accuracy of Borrower's representations, warranties and certifications.  In connection with such inspections, Lender and Lender's engineers, contractors and other representatives shall have the right to perform such environmental audits and other environmental examinations of the Real Property as Lender deem necessary or advisable from time to time.

6.3      <u>Water Adequacy</u>.  Within thirty (30) days of Lender's request, Borrower shall deliver to Lender a report containing such information as may be requested by Lender to demonstrate the sources and amount of water supply available to each parcel of the Land during the coming crop year, including the number of irrigated acres, the confirmed supply available and the per acre foot cost of such supply.

<u>SECTION 7.  AFFIRMATIVE COVENANTS.</u>

Borrower covenant and agree that so long as the Note shall be outstanding:

7.1      <u>To Pay Indebtedness</u>.  Borrower will punctually pay or cause to be paid the principal and interest (and prepayment premium, if any) to become due in respect of the Note according to the terms thereof and hereof (inclusive of any other permitted payments of which Borrower have notified Lender).

16

7.2     Maintenance of Borrower Office.  Borrower will maintain an office at 1306 W. Herndon Avenue, Suite 101, Fresno, CA 93711 (or such other place in the United States of America as Borrower may designate in writing to the holder of the Note).

7.3     To Keep Books.  Borrower and Guarantors will keep proper books of record and account in accordance with generally accepted accounting principles.

7.4     Payment of Taxes; Corporate Existence; Maintenance of Properties.  Borrower and Guarantors shall:

(a)     pay and discharge promptly all taxes, assessments and governmental charges or levies imposed upon it, its income or profits or its property before the same shall become in default, as well as all lawful claims and liabilities of any kind (including claims and liabilities for labor, materials and supplies) which, if unpaid, might by law become a Lien upon its property;

(b)     do all things necessary to preserve and keep in full force and effect its corporate existence, rights (charter and statutory) and franchises; and

(c)     maintain and keep all its properties used or useful in the conduct of its business in good condition, repair and working order and supplied with all necessary equipment and make all necessary repairs, renewals, replacements, betterments and improvements thereof, all as may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times.

7.5     To Insure.  Borrower shall (in addition to the insurance required to be maintained pursuant to the Deed of Trust):

(a)     keep all of its insurable properties owned by it insured against all risks usually insured against by persons operating like properties in the same geographical areas where the properties are located, all in amounts sufficient to prevent Borrower from becoming a coinsurer within the terms of the policies in question, but in any event in amounts not less than eighty percent (80%) of the then full replacement value thereof;

(b)     maintain public liability insurance against claims for personal injury, death or property damage suffered by others upon or in or about any premises occupied by it or occurring as a result of its maintenance or operation of any airplanes, automobiles, trucks or other vehicles or other facilities (including, but not limited to, any machinery used therein or thereon) or as the result of the use of products sold by it or services rendered by it;

(c)     maintain such other types of insurance with respect to its business as is usually carried by persons of comparable size engaged in the same or similar business and similarly situated; and

17

(d)     maintain all such worker's compensation or similar insurance as may be required under the laws of any State or jurisdiction in which it may be engaged in business.

All insurance for which provision has been made in <u>Section 7.5(b)</u> and <u>Section 7.5(c)</u> shall be maintained in at least such amounts as such insurance is usually carried by persons of comparable size engaged in the same or a similar business and similarly situated; and all insurance herein provided for shall be effected under a valid and enforceable policy or policies issued by insurers of recognized responsibility, except that Borrower may effect worker's compensation or other similar insurance in respect of operations in any State or other jurisdiction either through an insurance fund operated by such State or other jurisdiction or by causing to be maintained a system or systems of self-insurance which are in accord with applicable laws.

7.6     <u>Continued Operations</u>.  Borrower shall continue, in at least substantially the same manner and degree as present, Borrower's farming and orchard operations on the Property. Borrower acknowledges that such continued operations constitute a significant inducement to Lender to make the Loan.

7.7     <u>Notice of Change of Status</u>.  Borrower agrees that it shall promptly notify Lender of the following:

(a)     if any assets of Borrower are surrendered in satisfaction of a debt or obligation;

(b)     if any existing farm operating entity or real estate ownership entity of Borrower is dissolved or any trust comprising Borrower is revoked or amended;

(c)     if the lease for any land currently leased by Borrower expires or is terminated; or

(d)     upon the commencement of any litigation, including any arbitration or mediation, and of any proceedings before any governmental agency which could materially and adversely affect the Real Property, the Borrower, the Guarantors or Lender.

<u>SECTION 8.   SUBSTANTIAL BENEFITS; CONSEQUENCES OF LOAN STRUCTURE.</u>

8.1     Each of the Borrower and Guarantors understands and agrees that:

(a)     a default by the Borrower under the Deed of Trust, or the Note, Collateral Documents or other loan documents evidencing or securing any portion of the Loan will also constitute a default under both the Loan and the Related Loans, the Note, all other Related Notes, and other Loan Documents executed or delivered to evidence or secure the Loan or the Related Loans, or any portion thereof; provided, however that a default under the Related Notes and the

18

Related Loans shall not constitute a default under the Loan or the Loan Documents evidencing or securing the Loan;

        (b)    a default by Borrower under the Note or the Loan Documents, could result in the judicial or nonjudicial sale of some or all the Collateral for the Loan and/or the collateral for the Related Loans, and the application of the proceeds from such sale to complete or only partial satisfaction of the Borrower under the Note, any of the Related Notes, Loan Documents or Related Loan Documents.

    8.2    Intentionally Omitted.

    8.3    The proceeds of the Loan will be used to restructure the indebtedness encumbering the Property as an independent loan.

    8.4    After diligent inquiry, Borrower has determined that the Loan and collateral structure is beneficial to the Borrower's and the Guarantors' collective interests.

    8.5    Neither the Borrower nor any of the Guarantors is insolvent as of the date of this Agreement.  Neither the Borrower nor any of the Guarantors will become insolvent as a result of the obligations incurred and transfers made in connection with the Loan.  Neither the Borrower nor any of the Guarantors is, or is about to be, engaged in a business or transaction for which the Borrower or any Guarantor will have an unreasonably small amount of capital after the closing of the Loan.  Neither the Borrower nor the Guarantors has incurred, or contemplates incurring, debts beyond Borrower's or any Guarantor's ability to pay as such debts become due.

    8.6    The transfers made and obligations incurred by Borrower and the Guarantors in connection with the Loan are not made with the intent to hinder, delay or defraud any person to which Borrower or any Guarantor was, is, or hereinafter will become, indebted.

    8.7    Intentionally Omitted.

## SECTION 9.   RESTRICTIVE COVENANTS.

    Borrower covenants and agrees that so long as the Note shall be outstanding:

    9.1    <u>Current Ratio; Working Capital</u>.  Commencing at Closing and as of the end of each fiscal year thereafter, the Borrower shall not permit the ratio of Consolidated Current Assets to Consolidated Current Liabilities at any time to be less than the ratio of 1.25 to 1.0, excluding for purposes of the calculation receivable and payables from or to Affiliates.

19

Loan Agreement
FNF Farms, LLC
Loan No. 196960
78636001.6 0053564-00201

9.2     Intentionally Omitted.

9.3     <u>Restricted Payments</u>.

(a)     Borrower will not, directly or indirectly, make any Restricted Payments or incur any liability to make any Restricted Payments, or make advances or loans to any member, unless immediately after giving effect to such action, there shall not exist any Event of Default or event which, with notice or lapse of time or both, would become an Event of Default.   All dividends, distributions, purchases, redemptions, retirements, acquisitions and payments made pursuant to this <u>Section 9.3</u> in property other than cash shall be included for purposes of calculations pursuant to this <u>Section 9.3</u> at the fair market value thereof (as determined in good faith by the manager of Borrower) at the time of declaration of such dividend or at the time of making such distribution, purchase, redemption, retirement, acquisition or payment.

(b)     Borrower's outstanding membership, partnership or other equity interests shall remain free and clear of any and all Liens at all times.

9.4     <u>Merger or Consolidation</u>.  The Borrower will not consolidate with or merge into any Person, or permit any Person to merge into it, or sell, transfer or otherwise dispose of all or substantially all of its properties and assets.

9.5     <u>Transactions with Affiliates</u>.  Borrower will not engage in any transaction with an Affiliate on terms more favorable to the Affiliate than would have been obtainable in arm's length dealing in the ordinary course of business with a Person not an Affiliate.  Borrower hereby agrees that all Subordinate Debt or any inter-Borrower loans involving any one or more Borrower shall be subordinate in all respects to the Loan and no payment of any amounts owing in connection therewith at a time when an Event of Default exists may be made until the earlier of Lender's waiver of such Event of Default or the repayment in full of all amounts owing to Lender in connection with the Loan.  To the extent any amounts are received in any manner whatsoever in connection with such inter-Borrower loans by an obligee thereof during the period described in the immediately preceding sentence, such amounts shall be held in trust for and paid over to Lender until Lender are in receipt of all amounts owing to Lender in connection with the Loan.  Upon the request of Lender, Borrower shall enter into a debt subordination agreement agreeable to Lender with respect to any Subordinated Debt.

9.6     <u>Maintain Organizational Existence</u>.  Borrower shall at all times maintain its existence as a limited liability company or corporation, as applicable, in the state of California and any other jurisdiction where it transacts business.  Absent Lender's prior written consent, Borrower will change its name or jurisdiction of organization.

9.7     <u>Transfers and Encumbrances</u>.  Borrower shall not assign, transfer, convey, encumber or hypothecate any of its direct or indirect interest in any of the Collateral or of any

20

interest in Borrower absent Lender's prior written consent which may be withheld or conditioned in Lender's sole and absolute discretion, except as expressly permitted in the Deed of Trust or in Section 10 hereof. Upon the written request of the Borrower, Lender will subordinate its interest in crops growing or to be grown on the Real Property and all governmental payments relating to such crops (the "**Crops**"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "**Crop Lender**") for one or more loans made to Borrower to finance the production of Crops on all or any portion of the Real Property ("**Operating Financing**"), upon the satisfaction of each of the following conditions in Lender's sole and absolute discretion:

(a)     no Event of Default exists under any of the Note, the Deed of Trust, the Collateral Documents or any other documents executed to evidence or secure the Loan nor does any event exist which with the giving of notice or the passage of time or both would constitute an Event of Default;

(b)     Borrower has provided Lender with pro forma cash flow projections demonstrating to Lender's reasonable satisfaction that the amount of the Operating Financing will not render the security for the Loan inadequate or impair the Borrower's ability to pay and perform its obligations under the Loan, together with copies of all documents prepared to evidence or secure the Operating Financing;

(c)     no outstanding lien remains for an Operating Financing for which Lender has previously subordinated;

(d)     any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances;

(e)     under no circumstances will the subordination of Lender's security interest in Crops extend to Crops produced on the Real Property after the harvest of any Crops growing at the time of transfer of title to the Real Property pursuant to judicial or non-judicial foreclosure of the Deed of Trust; and

(f)     any default under the Operating Financing shall constitute an Event of Default under this Agreement, the Note and the Deed of Trust.

SECTION 10.   PARTIAL RELEASE/ORDINARY COURSE ENCUMBRANCES.

10.1   Encumbrances of Real Property in the Ordinary Course.   Notwithstanding any provision of the Loan Documents to the contrary, Borrower shall have the right to enter into any of the following transactions that are in the ordinary course of business of an owner and operator

21

of agricultural properties in the Central Valley of California with respect to the Real Property under the conditions set forth below:

      (a)    Enter into leases with respect to any portion of the Real Property for its intended farming or other related purposes with an Affiliate, so long as such lease is subordinate to the Deed of Trust, does not impair the Water Rights or other attributes of any portion of the Real Property and a copy of the related lease is provided to Lender consistent with the final paragraph of this Section 10.1;

      (b)    Grant easements encumbering portions of the Real Property to third parties for purposes of facilitating access for neighboring properties, for traversing the property with transmission lines, underground pipeline for the transportation of water or oil and gas or for other ordinary and customary purposes compatible in all respects with a farming operation on the Real Property of a scope and nature in existence as of the date of this Agreement, so long in each instance:

      (i)    the easement is subordinate to the Deed of Trust unless otherwise expressly agreed in writing by Lender;

      (ii)    the easement does not contain any environmental indemnities by the landowner or other indemnities outside the ordinary course or otherwise materially expose the owner of the Real Property to contractual liability;

      (iii)    the easement shall not impair the use or functionality of the Real Property (i.e. it shall not preclude or impair access to improvements, wells, pumps, motors, irrigation equipment, Water Rights or other items necessary for the continued operation of the Real Property nor render the farming or other use of the Real Property inefficient or more costly) or materially impair the value of the Real Property. The easement shall not otherwise materially adversely impact the farming or orchard operations, water supply or the overall loan to value in effect at the origination of the Loan, as determined by the Lender in its sole discretion.

At least annually, but in any event upon request by Lender (which in the absence of a default shall not occur more than once per calendar year), Borrower shall provide Lender with a summary of all transactions completed pursuant to the rights contained in this Section 10.1 including the affected portion of the Real Property, the grantee of the applicable rights and a copy of the related documentation.

SECTION 11. DEFAULTS AND REMEDIES.

    11.1    Events of Default; Acceleration. The occurrence of one or more of the following events (herein called "**Events of Default**" and singularly, an "**Event of Default**")) shall constitute an Event of Default under this Agreement (and whether such occurrence shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree

22

or order of any court or any order, rule or regulation of any administrative or governmental body):

      (a)    default in the payment of any interest upon the Note when such interest becomes due and payable; or

      (b)    default in the payment of principal of (or prepayment premium, if any, on) the Note when and as the same shall become due and payable, whether at maturity or at a date fixed for principal payment or prepayment, or by acceleration or otherwise; or

      (c)    default in the performance or observance of any other covenant, agreement or condition contained herein, in the Note or the Deed of Trust within thirty (30) days after receipt of written notice from Lender specifying the nature of the default, provided however, if such default cannot be cured within the 30-day period, then so long as Borrower have commenced and diligently pursues the cure of the related default, within ninety (90) days following receipt of written notice, and further provided that no notice of default or opportunity for cure shall be required if during the prior twelve (12) months, Lender has already sent a notice to Borrower identifying Borrower's default in performance of the same obligation; or

      (d)    any Event of Default under the Deed of Trust or any Default or event of Default under any Collateral Document or Loan Document (following the expiration of any applicable cure period) shall occur; or

      (e)    Borrower shall not pay when due, whether by acceleration or otherwise, any evidence of indebtedness of Borrower (other than the Note), or any condition or default shall exist under any such evidence of indebtedness or under any agreement under which the same may have been issued permitting such evidence of indebtedness to become or be declared due prior to the stated maturity thereof, and the expiration of any applicable cure period; or

      (f)    Borrower or Guarantor shall file a petition seeking relief for itself under Title 11 of the United States Code, as now constituted or hereafter amended, or an answer consenting to, admitting the material allegations of or otherwise not controverting, or shall fail to timely controvert, a petition filed against Borrower or Guarantor seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended; or Borrower or Guarantor shall file such a petition or answer with respect to relief under the provisions of any other now existing or future bankruptcy, insolvency or other similar law of the United States of America or any State thereof or of any other country or jurisdiction providing for the reorganization, winding-up or liquidation of corporations or an arrangement, composition, extension or adjustment with creditors; or

      (g)    a court of competent jurisdiction shall enter an order for relief which is not stayed within sixty (60) days from the date of entry thereof against Borrower or Guarantor under

Title 11 of the United States Code, as now constituted or hereafter amended; or there shall be entered an order, judgment or decree by operation of law or by a court having jurisdiction in the premises which is not stayed within sixty (60) days from the date of entry thereof adjudging Borrower or Guarantor as bankrupt or insolvent, or ordering relief against Borrower or Guarantor, or approving as properly filed a petition seeking relief against Borrower or Guarantor, under the provisions of any other now existing or future bankruptcy, insolvency or other similar law of the United States of America or any State thereof or of any other country or jurisdiction providing for the reorganization, winding-up or liquidation of corporations or an arrangement, composition, extension or adjustment with creditors, or appointing a receiver, liquidator, assignee, sequestrator, trustee, custodian or similar official of Borrower or Guarantor or of any substantial part of its property, or ordering the reorganization, winding-up or liquidation of its affairs; or any involuntary petition against Borrower or Guarantor seeking any of the relief specified in this clause shall not be dismissed within sixty (60) days of its filing; or

(h)     Borrower or Guarantor shall make a general assignment for the benefit of its creditors; or Borrower or Guarantor shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, sequestrator, trustee, custodian or similar official of Borrower or Guarantor or of all or any substantial part of its property; or Borrower or Guarantor shall have admitted to its insolvency or inability to pay, or shall have failed to pay, its debts generally as such debts become due; or Borrower or Guarantor or its trustees, directors or members shall take any action to dissolve or liquidate Borrower or Guarantor; or

(i)     Borrower or Guarantor shall (1) engage in any non-exempted "prohibited transaction," as defined in Sections 406 and 408 of ERISA and Section 4975 of the Internal Revenue Code of 1986, as amended, (2) incur any "accumulated funding deficiency," as defined in Section 302 of ERISA, in an amount in excess of Ten Thousand and 00/100 Dollars ($10,000), whether or not waived, or (3) terminate or permit the termination of an "employee pension benefit plan," as defined in Section 3 of ERISA, in a manner which could result in the imposition of a Lien on any property of Borrower or Guarantor pursuant to Section 4068 of ERISA securing an amount in excess of Ten Thousand and 00/100 Dollars ($10,000.00); or

(j)     any representation or warranty made by Borrower in <u>Section 4</u> hereof or in any Collateral Document or in any certificate or instrument furnished in connection therewith shall prove to have been false or misleading in any material respect as of the date made, provided that Borrower shall have ten (10) days following the written identification by Lender of the related misrepresentation or breach of warranty to cure the related misrepresentation if unintentional and if Lender is thereby placed in the same risk position as if the misrepresentation had not been made; or

(k)     the Collateral or any portion thereof is sold, conveyed, transferred, assigned or disposed of, or the Real Property is rezoned, either voluntarily or involuntarily, or an

24

agreement for any of the foregoing is entered into, other than transfers permitted under the Loan Documents; or

(l)      the dissolution or death of Borrower or any Guarantor, whether by operation of law or otherwise; provided, however, that the death of a Guarantor will not be an Event of Default under this Agreement if any remaining Guarantor(s) collectively meet the Net Worth Requirement and at least two of the original Guarantors remain Guarantors with legal control of the Real Property.  If the remaining Guarantor(s) collectively fail to meet the Net Worth Requirement, then the death of any Guarantor shall not be an Event of Default so long as the Borrower or remaining Guarantor(s), within one hundred twenty (120) days of the subject event, cause another person or persons to assume the obligations of the deceased Guarantor under the Guaranty and the Indemnity Agreement, so that the Guarantors (including any new Guarantor(s)) collectively meet the Net Worth Requirement and Guarantors have legal control over the Real Property.  For purposes hereof, "legal control" shall mean the power, either directly or indirectly, to exercise the authority of the Borrower as owner of the Real Property, either as the majority shareholder of the common stock of a corporation, trustee of a trust, the sole general partner of a limited partnership, the managing general partner of a general partnership, or the manager or managing member of a limited liability company.  In either case, the Lender shall be promptly advised of the event of death.

Upon an Event of Default, at Lender's option, the entire outstanding principal amount of the Note, together with accrued interest thereon at the Default Interest Rate, shall immediately become due and payable without notice or demand. In the event that a tender of the foregoing sum is received at a time when a prepayment premium would otherwise apply or prepayment would be prohibited under the Note, such tender shall be deemed to be a voluntary prepayment under the Note, and in addition to principal and interest due as aforesaid, the Borrower agrees to pay the prepayment price, computed as provided in the Note (except that, for purposes of such computation, the prepayment date shall be deemed to be the date upon which the holder of the Note shall have declared the Note to be due and payable).

BORROWER EXPRESSLY (A) WAIVES ANY RIGHTS IT MAY HAVE UNDER CALIFORNIA CIVIL CODE SECTION 2954.10 TO PREPAY THE NOTE, IN WHOLE OR IN PART, WITHOUT FEE OR PENALTY, UPON ACCELERATION OF THE MATURITY DATE OF THE NOTE, AND (B) AGREES THAT IF, FOR ANY REASON, A PREPAYMENT OF THE NOTE IS MADE, UPON OR FOLLOWING ANY ACCELERATION OF THE MATURITY DATE OF THE NOTE BY THE HOLDER THEREOF ON ACCOUNT OF ANY DEFAULT BY BORROWER UNDER ANY LOAN DOCUMENT, INCLUDING BUT NOT LIMITED TO ANY TRANSFER, FURTHER ENCUMBRANCE OR DISPOSITION WHICH IS PROHIBITED OR RESTRICTED BY THE DEED OF TRUST, THEN BORROWER SHALL BE OBLIGATED TO PAY CONCURRENTLY THE PREPAYMENT FEE SPECIFIED IN THE NOTE (IF APPLICABLE).  BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, BORROWER AGREES THAT LENDER'S AGREEMENT TO

Loan Agreement
FNF Farms, LLC
Loan No. 196960
78636001.6 0053564-00201

MAKE THE LOAN AT INTEREST RATE AND FOR THE TERM SET FORTH IN THE NOTE AND THIS AGREEMENT CONSTITUTES ADEQUATE CONSIDERATION FOR THIS WAIVER AND AGREEMENT.

INITIALS OF AUTHORIZED SIGNATORY OF BORROWER:


FNF

11.2   <u>Remedies Upon Default</u>.   In case an Event of Default shall occur and be continuing, the holder of the Note may proceed to protect and enforce its rights by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant contained in the Note, this Agreement or any Loan Document or in aid of the exercise of any power granted in the Note, this Agreement or any Loan Document or may proceed to enforce the payment of the Note or to enforce any other legal or equitable right of the holder of the Note including without limitation, taking of the following actions, concurrently or successively, without notice to Borrower.  Borrower agrees that its obligations under the Note are of the essence, and upon application to any court of equity having jurisdiction in the premises, a decree against Borrower requiring specific performance of such obligations.

(a)   Declare the Note to be, and the Note shall thereupon become, immediately due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, anything contained herein or in the Note to the contrary notwithstanding; or

(b)   Enter upon and take possession of the Real Property and all material, equipment and supplies thereon and water rights available thereto (including without limitation Borrower's rights under the Water Supply Agreement and Easement) and to fulfill the obligations of Borrower hereunder and to sell, manage, repair, and protect the Real Property. Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution, (i) to pay, settle or compromise all existing bills and claims which may be liens or security interests against the Real Property or any fixtures or equipment thereon, or as may be necessary or desirable for the clearance of title or otherwise, and (ii) to use any funds of Borrower, including any Loan balance which might not have been disbursed.

(c)   Declare an Event of Default under the Related Loans.

11.3   <u>Remedies Not Waived</u>.  No course of dealing between the holder of the Note and Borrower or any delay or failure on the part of the holder in exercising any rights under the Note, any Loan Document or hereunder shall operate as a waiver of any rights of such holder.

26

11.4    <u>Remedies Cumulative</u>.   No remedy herein or in the Note or in any Loan Document conferred upon the holder of the Note is intended to be exclusive of any other remedy and each and every remedy shall be in addition to every other remedy given hereunder or under the Note or under any Loan Document or now or hereafter existing at law or in equity or by statute or otherwise.

11.5    <u>Costs and Expenses</u>.   Borrower shall pay to the holder of the Note, to the extent permitted under applicable law, all reasonable out-of-pocket expenses incurred by such holder as shall be sufficient to cover the cost and expense of enforcing such holder's rights under the Note and any Loan Document or the collecting and foreclosing upon, or otherwise dealing with, the Collateral, or participating in any litigation or bankruptcy proceeding for the protection or enforcement of the holder's collateral or claim against Borrower or any Guarantors of the Note or otherwise incurred in connection with the occurrence of an Event of Default, said expenses to include reasonable compensation to the attorneys and counsel of such holder for any services rendered in that connection, upon the Note held by such holder.

<u>SECTION 12.</u> <u>MISCELLANEOUS.</u>

12.1    <u>Loss or Damage</u>.   In case of loss or damage by fire or otherwise to the Real Property or any part thereof, Borrower will forthwith notify Lender of same and Lender may make proof of such loss if the same is not promptly made by Borrower or if Lender deem it desirable to do so.   Lender is authorized to adjust, collect, and compromise, in its reasonable discretion, all claims under insurance policies covering the loss in question.   All insurance proceeds shall be paid directly and solely to Lender and each insurance company is authorized and directed to make such payment directly and solely to Lender, and the insurance policies shall so stipulate.   All insurance proceeds may, subject to the sentence immediately below, be applied either to the reduction of the indebtedness under this Agreement or to the restoration, repair, replacement or rebuilding of the portion of the Real Property so damaged in such manner as Lender may determine, and any application thereof to the indebtedness shall not release or relieve Borrower from making the payments or performing the other agreements and obligations herein required until the indebtedness is paid in full.   If and only so long as no Event of Default has occurred and is continuing hereunder and provided that the insurance proceeds, when combined with the portion of this Loan not yet disbursed, are sufficient in Lender's judgment, after first deducting and paying the expenses, if any, incurred by Lender in the collection of the proceeds of the insurance, to otherwise pay all costs and expenses relating thereto and to this Loan (including the payment of interest and other carrying costs) or if such proceeds are not sufficient as above provided, provided that Borrower deposits with Lender, the amount of such deficiency, as determined by Lender within ten (10) Business Days of demand therefor and further provided that the insurance Borrower shall not claim that, notwithstanding such payment to Lender, it had no liability to pay any or some portion of such proceeds to Borrower, then the balance of the proceeds, plus any amounts deposited by Borrower, will be held and disbursed by

27

Lender, from time to time, for the purpose of the repair, restoration, building or rebuilding of the Real Property in accordance with such procedures as may be established by Lender.

12.2   <u>Assignment by Lender</u>.   Lender may assign, negotiate, pledge or otherwise hypothecate all or any portion of this Agreement or grant participations herein, or in any of its rights and security hereunder, including, without limitation, the Note and the Loan Documents and, in the case of such assignment, Borrower will accord full recognition thereto and agree that all rights and remedies of Lender in connection with the interest so assigned shall be enforceable against Borrower by such assignee with the same force and effect and to the same extent as the same would have been enforceable by Lender but for such assignment provided that in connection with any such assignment Lender shall give Borrower at least sixty (60) days prior written notice of such assignment and such assignee agrees to be bound by the terms and provisions hereof.

Borrower shall not assign or attempt to assign any of its rights under this Agreement, either voluntarily or by operation of law.

12.3   <u>Time is of the Essence</u>.   Time is of the essence of this Agreement.

12.4   <u>No Waiver</u>.   No waiver of any term, provision, condition, covenant, or agreement herein contained shall be effective unless set forth in a writing signed by Lender, and any such waiver shall be effective only to the extent set forth in such writing.   No failure by Lender to exercise, or delay by Lender in exercising, any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, power or privilege.   The rights and remedies provided in this Agreement are cumulative and not exclusive of any right or remedy provided by law.   No notice or demand on Borrower in any case shall, in itself, entitle Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand.

12.5   <u>No Joint Venture</u>.   Nothing herein, in the Note, the Loan Documents, or in any other Loan Document contained, and no action or inaction whatsoever on the part of Lender, shall be deemed to make Lender a partner or joint venturer with Borrower, and Borrower shall protect, defend, indemnify and hold Lender harmless from and against all claims, loss, cost, expense (including attorneys' fees) and damages arising from the relationship between Lender and Borrower being construed or alleged to be as anything other than that of secured lender and borrower.

12.6   <u>Entire Agreement</u>.   This Agreement and the attached Exhibits hereto and the other documents referred to herein constitute the entire agreement between the parties hereto and may

28

not be modified or amended in any manner other than by supplemental written agreement executed by the parties hereto.

     12.7   <u>Severability; Consistency</u>.  If any provision of this Agreement or the application thereof to any person or situation shall, to any extent, be held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to persons or situations other than those to which it shall have been held invalid or unenforceable, shall not be affected thereby, but shall continue valid and enforceable to the fullest extent permitted by law.  The Loan Documents are intended to be consistent with each other and should be interpreted to such effect.

     12.8   <u>Agreement Not to Benefit Third Parties</u>.  This Agreement is made for the sole benefit of Borrower and Lender, and no other person shall be deemed to have any privity of contract hereunder nor any right to rely hereon to any extent for any purpose whatsoever, nor have any right of action of any kind hereon nor be deemed to be a third party beneficiary hereunder.

     12.9   <u>No Documents to be Recorded</u>.  Borrower covenants that it will not cause or permit any document or instrument to be placed of record with respect to the Land or the Real Property without Lender's prior written consent.

     12.10   <u>Loss, Theft, Destruction or Mutilation of Note</u>.  Upon receipt of evidence satisfactory to the Borrower of the loss, theft, destruction or mutilation of the Note, and, in the case of any such loss, theft or destruction, upon receipt of a bond of indemnity reasonably satisfactory to the Borrower or, in the case of any such mutilation, upon surrender and cancellation of such Note, the Borrower will make and deliver, in lieu of such lost, stolen, destroyed or mutilated Note, a new Note(s) of like tenor and unpaid principal amount and dated the date of, or, if later, the date to which interest has been paid on, the lost, stolen, destroyed or mutilated Note.

     12.11   <u>Expenses</u>.  In addition to the loan fee previously paid to Lender Borrower shall pay all costs of closing the Loan and all of Lender's expenses with respect thereto, including but not limited to, legal fees, disbursements and travel expenses of counsel for Lender (including legal fees incurred by Lender subsequent to the closing of the Loan in connection with the administration, collection or transfer of the Loan); all recording fees and charges; title insurance premiums and costs, escrow and funding charges; surveys; intangible taxes; environmental assessments; expenses of foreclosure (including trustee's and attorney's fees); and similar items. Borrower's obligations under this <u>Section 12.11</u> shall survive the payment or prepayment of the Note.

     12.12   <u>Stamp Taxes, Recording Fees, etc.</u>  Borrower shall pay, and save Lender and any subsequent holder of the Note harmless against, any and all liability (including any interest or

29

penalty for non-payment or delay in payment) with respect to stamp and other taxes (other than any such stamp or other taxes incurred upon a transfer of the Note by Lender), if any, and all recording and filing fees which may be payable or determined to be payable in connection with the transactions contemplated by this Agreement and the Loan Documents, including, without limitation, the issuance and delivery of the Note, the execution, delivery, filing and recording of the Loan Documents and financing statements related thereto, or any modification, amendment or alteration thereof.  The obligations of Borrower under this Section 12.12 shall survive the payment or prepayment of the Note.

12.13  Successors and Assigns.   All covenants, agreements, representations and warranties made herein, in the Loan Documents and in the Note or in certificates delivered in connection herewith by or on behalf of Borrower shall survive the issuance and delivery of the Note to Lender, the making of the Loan by Lender, and shall bind the successors and assigns of Borrower, whether so expressed or not, and all such covenants, agreements, representations and warranties shall inure to the benefit of Lender's successors and assigns, including any subsequent holder of the Note.

12.14  Notices.  All communications provided for hereunder, under the Loan Documents or under the Note  shall be in writing, in the manner and to the parties as set forth in the Deed of Trust.

12.15  Law Governing; Modification.  This Agreement shall be construed in accordance with and governed by laws of the State of California.  No provision of this Agreement may be waived, changed or modified, or the discharge thereof acknowledged, orally, but only by an agreement in writing signed by the party against whom the enforcement of any waiver, change, modification or discharge is sought.

12.16  Headings.  The headings of the sections and subsections of this Agreement are inserted for convenience only and do not constitute part of this Agreement.

12.17  Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

12.18  FINAL CREDIT AGREEMENT.  THIS WRITTEN AGREEMENT, THE NOTE AND THE LOAN DOCUMENTS ARE THE FINAL EXPRESSION OF THE CREDIT AGREEMENT BETWEEN BORROWER AND LENDER AND MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR OR CONTEMPORANEOUS ORAL AGREEMENT BETWEEN BORROWER AND LENDER.  BORROWER AND LENDER HEREBY AFFIRM THAT THERE IS NO UNWRITTEN ORAL CREDIT AGREEMENT BETWEEN BORROWER AND LENDER WITH RESPECT TO THE SUBJECT MATTER OF

THIS WRITTEN CREDIT AGREEMENT, THE NOTE, THE LOAN DOCUMENTS, AND ANY RELATED LOAN DOCUMENTS.

*(Signatures follow on next pages)*

31

IN WITNESS WHEREOF, Borrower and Guarantors have executed this Loan Agreement, or have caused this Loan Agreement to be executed by its duly authorized representative(s) as of the day and year first written above.

BORROWER:

FNF FARMS, LLC, a
California limited liability company

By: _____
Farid Assemi
Its General Manager

By: _____
Farshid Assemi
Its General Manager

By: _____
Darius Assemi
Its General Manager

Loan Agreement
FNF Farms, LLC
Loan No. 196960
78636001.6 0053564-00201

GUARANTORS:

_____
FARID ASSEMI

_____
FARSHID ASSEMI

_____
DARIUS ASSEMI

33

The foregoing agreement is hereby accepted as of the date first above written.

METROPOLITAN LIFE INSURANCE COMPANY

By _____

Its _Director_ ___ Leon A. Moreno

34

EXHIBIT A

Description of Land

Real property in the unincorporated area of the County of Fresno, State of California, described as follows:

Real property situate in the County of Fresno, State of California, described as follows:

PARCEL 1: (APN: 038-200-04)
FNF FARMS LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

THE EAST HALF OF SECTION 28, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF FRESNO, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED ONE-HALF INTEREST IN AND TO ALL OIL, GAS AND OTHER HYDROCARBONS AND MINERALS THEREIN AND THEREUNDER TOGETHER WITH ALL EASEMENTS AND RIGHTS NECESSARY OR CONVENIENT FOR THE PRODUCTION, STORAGE AND TRANSPORTATION THEREOF AND THE EXPLORATION AND TESTING OF SAID REAL PROPERTY AND ALSO THE RIGHT TO DRILL FOR, PRODUCE AND USE WATER FROM SAID REAL PROPERTY IN CONNECTION WITH DRILLING OR MINING OPERATIONS THEREON, AS RESERVED BY JOHN J. ADAMS, ET UX, IN DEED RECORDED APRIL 11, 1963, AS DOCUMENT NO. 30302, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM AN UNDIVIDED ONE-FOURTH INTEREST IN AND TO ALL OIL, GAS AND OTHER HYDROCARBONS AND MINERALS THEREIN AND THEREUNDER, AS RESERVED IN THE DEED DATED NOVEMBER 1, 1965, FROM ROLAND D. BRUBAKER, ET UX, TO W. J. DEAL, ET UX, RECORDED DECEMBER 27, 1965, AS DOCUMENT NO. 103372, OFFICIAL RECORDS.

PARCEL 2: (APN: 038-200-09)
FNF FARMS LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

THE NORTHWEST QUARTER OF SECTION 28, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF FRESNO, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL THE COAL AND OTHER MINERALS IN THE LANDS SO ENTERED AND PATENTED, TOGETHER WITH THE RIGHT TO PROSPECT FOR, MINE AND REMOVE THE SAME PURSUANT TO THE PROVISIONS AND LIMITATIONS OF THE ACT OF DECEMBER 29, 1916 (39 STAT. 862), AS RESERVED IN THE PATENT FROM UNITED STATES

Exhibit A - 1

OF AMERICA, TO FRANK ALDEN DUSTIN, DATED SEPTEMBER 11, 1922, AND RECORDED SEPTEMBER 22, 1922, IN BOOK 239 PAGE 164 OF OFFICIAL RECORDS.

PARCEL 3:  (Access Easement)

A non exclusive easement for ingress and egress over and across an existing roadway located across the easterly 20 feet of Section 21, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the official plat thereof, upon the rights, terms and conditions contained in that certain "Access Agreement" dated July 23, 2015, by and among Waterford Farms, LLC, a California limited liability company and FNF Farms, LLC, a California limited liability company.

Portion APN 038-130-19s and 038-130-58s

Exhibit A - 2

EXHIBIT B
SCHEDULED LIENS AND LEASES

1.   Those encumbrances reflected in Schedule B Part II of the title insurance policy issued to
     Lender as of the Closing Date and insuring the lien of the Deed of Trust.

Exhibit B - 1

<u>EXHIBIT C</u>
<u>AFFILIATE INDEBTEDNESS</u>

1.      That certain Unsecured Multiple Advance Promissory Note (PN1068) dated January 1, 2013, made by FNF Farms, LLC, a California limited liability company and payable to the order of Granville Farms, LLC, a California limited liability company, (f/k/a Granville Farms, LP, a California limited partnership, in the original principal amount of up to $3,000,000.00 (balance $363,000.00).

Exhibit C - 1